STEVEN G. KALAR
Federal Public Defender
ELLEN V. LEONIDA
Assistant Federal Public Defender
555 - 12th Street, Suite 650
Oakland, CA 94607-3627
Telephone:  (510) 637-3500
Fax: (510) 637-3507
Email: ellen_leonida@fd.org

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLICATION FOR TELEPHONE INFORMATION NEEDED FOR A CRIMINAL INVESTIGATION | CR 15-XR-90304-HRL-1(LHK)<br><br>RESPONSE TO GOVERNMENT'S APPEAL OF DENIAL OF APPLICATION, UNDER 18 U.S.C. § 2703(D), FOR HISTORICAL CELL SITE LOCATION INFORMATION |

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………….....1

BACKGROUND……………………………………………………………………………...1

ARGUMENT……………………………………………………………………..…………5

    I.    THE FOURTH AMEDMENT PROHIBITS THE WARRANTLESS SEARCH AND SEIZURE OF CSLI………………………………………………….………………5

        A.  CSLI Is Protected by the Fourth Amendment Right to Privacy………………..………5

    II.    CELL PHONE USERS DO NOT FOREFIT THEIR FOURTH AMENDMENT RIGHTS SIMPLY BECAUSE THEIR CSLI RECORDS ARE MAINTAINED BY THIRD-PARTY CELL PHONE PROVIDERS……………………………………………..……9

        A.  An Individual Does Not Lose His Right to Privacy in CSLI Simply Because It Is Disclosed to a Cell Phone Provider…………………………………..………………9

        B.  Cell Phone Users Do Not Voluntarily Convey CSLI to a Third Party……………..…12

        C.  A Service Provider's Ability to Access CSLI in the Course of Business Does Not Defeat the Subscriber's Reasonable Expectation of Privacy……………………….14

    III.    THE ELEVENTH AND FIFTH CIRCUITS ERRED IN CONCLUDING THAT SUBCRIBERS HAVE NO CONSTITUTIONALLY PROTECTED PRIVACY INTEREST IN THEIR CSLI……………………………………………………….…17

    IV.    *RILEY* IMPLICITLY RECOGNIZES A PRIVACY INTEREST IN CSLI……………………………………………………………………….....…20

    V.    REQUIRING A WARRANT AND PROBABLE CAUSE BEFORE ALLOWING THE GOVERNMENT TO ACCESS CSLI IS CONSISTENT WITH THE SCA…………...22

        A.  The Stored Communications Act Did Not Contemplate CSLI.................................23

        B.  The SCA Gives Magistrates Discretion to Require a Warrant for CSLI……………………………………………………………………....27

    VI.    THE GOVERNMENT MAY OBTAIN CSLI WITH A WARRANT BASED ON PROBABLE CAUSE………………………………………………………31

CONCLUSION………………………………………………………………………….....32

## TABLE OF AUTHORITIES

*A.C.L.U. v. Clapper*, __ F.3d __, 2015 WL 2097814 (2nd Cir. 2015)........................................19

*Almeida-Sanchez v. United States*, 413 U.S. 266 (1973)………………………………………..22

*American Civil Liberties Union of Northern California v. Department of Justice,* No. 12-cv-4008 MEJ (N.D. Cal. Sept. 23, 2013)…................................................................................5

*Beck v. Prupis*, 529 U.S. 494 (2000)………………………………………………………………29

*Bond v. United States*, 529 U.S. 334 (2000)………………………………………………………18

*California v. Hodari D.*, 499 U.S. 621 (1991)……………………………………………………..28

*Clark v. Martinez*, 543 U.S. 371 (2005)……………………………………………………………30

*Donaldson v. United States*, 400 U.S. 517 (1971)……………………………………………………15

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001)……………………………………………………18

*In re Application,* 724 F.3d 600 (5th Cir. 2013)……………………………………………………*passim*

*In re United States*, 441 F. Supp. 2d 816 (S.D. Tex. 2006)………………………………………...23

*In the Matter of an Application*, 809 F. Supp. 2d 113 (E.D. N.Y. 2011)………………………..12

*In the Matter of the Application*, 620 F.3d 304 (3d Cir. 2010)…………………………...*passim*

*Katz v. United States*, 389 U.S. 347 (1967)……………………………………………………………5

*Kyllo v. United States*, 533 U.S. 27 (2001)……………………………………………………*passim*

*Mancusi v. DeForte*, 392 U.S. 364 (1968)……………………………………………………………18

*Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005)……………………………………………28

*Maryland v. King*, 133 S. Ct. 1958 (2013)……………………………………………………………14

*POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228 (2014)…………………………………27

*Patel v. City of Los Angeles*, 738 F.3d 1058 (9th Cir. 2013)…………………………………………22

*Quon v. Arch Wireless Operating Co., Inc.*, 529 F.3d 892 (9th Cir. 2008)……………………...18

*SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984)………………………………......……...……15

*Smith v. Maryland*, 442 U.S. 735 (1979)……………………………………………......…9

*U.S. v. Davis*, __ F.3d __, 2015 WL 2058977 (11th Cir. 2015)……………………….…*passim*

*United States v. Cooper*, 2015 WL 881578 (N.D. Cal. Mar. 2, 2015)……………....…*passim*

*United States v. Davis*, 754 F.3d 1205 (11th Cir. 2014)…………………………….…*passim*

*United States v. Johnson*, 457 U.S. 537 (1982)…………………………………………31

*United States v. Johnson*, 680 F.3d 1140 (9th Cir. 2012)……………………………….27

*United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010)…………………………...19, 21

*United States v. Miller*, 425 U.S. 435 (1976)…………………………………….....9, 10

*United States v. Pineda-Moreno*, 617 F.3d 1120 (9th Cir. 2010)……………………….11

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012)………………………....……28

*United States v. Robinson*, 414 U.S. 218 (1973)………………………….…………11

*United States v. Taketa*, 923 F.2d 665 (9th Cir. 1991)…………………………………18

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010)………………….…...16, 27

*United States v. Williams*, 659 F.3d 1223 (9th Cir. 2011)………………………………27

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994)…………………………30

## OTHER FEDERAL AUTHORITIES

18 U.S.C. § 2703……………………………………………………………*passim*

18. U.S.C. § 3123…………………………………………………….…… 29

47 C.F.R. § 20.18…………………………………………….…………..25

47 U.S.C. § 1002…………………………………………………………23

Fed. R. Crim. P. 41…………………………………….……..1, 31

iii

# OTHER AUTHORITIES

Adam Liptak, *Major Ruling Shields Privacy of Cellphones*, N.Y. Times (June 25, 2014), http://www.nytimes.com/2014/06/26/us/supreme-court-cellphones-search-privacy.html............20

Andrea Meyer, 30th Anniversary of the First Commercial Cell Phone Call, Verizon Wireless News Center, (October 11, 2013), http://www.verizonwireless.com/news/article/2013/10/30th-anniversary-cell-phone.html....................................................................................................................24

Andrew Kupfer, AT&T's $12 Billion Cellular Dream, Fortune, Dec. 12, 1994, at 110, available at, http://archive.fortune.com/magazines/fortune/fortune_archive/1994/12/12/80051/index.htm.......2

*Annual Wireless Industry Survey*, CTIA - The Wireless Association, http://www.ctia.org/your-wireless-life/how-wireless-works/annual-wireless-industry-survey.................................................1

Aya Gruber, *Garbage Pails and Puppy Dog Tails: Is That What* Katz *Is Made Of?,* 45 U.C. Davis L. Rev. 781 (2008)…………………………………………………………………………………10

*Device Ownership Over Time*, Pew Research Internet Project, http://www.pewinternet.org/data-trend/mobile/device-ownership/.........................................................................................................1

*Electronic Communications Privacy Act (ECPA) (Part II): Geolocation Privacy and Surveillance, Hearing before the Subcomm. on Crime, Terrorism, Homeland Security, and Investigations, of the H. Comm. on the Judiciary*, 113th Cong., 50 (2013)………………………2

*Electronic Communications Privacy Act Reform and the Revolution in Location Based Technologies and Services, Hearing before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong., 16 (2010)……….........................4

For Second Year in a Row, Markey Investigation Reveals more than One Million Requests by Law Enforcement for Americans Mobile Phone Data, Press Release from Ed Markey, (December 9, 2013) available at: http://www.markey.senate.gov/news/press-releases/for-second-year-in-a-row-markey-investigation-reveals-more-than-one-million-requests-by-law-enforcement-for-americans-mobile-phone-data.............................................................................................................................................25

Harris Interactive, *2013 Mobile Consumer Habits Study*, Jumio, Inc., 2 (June 2013), http://pages.jumio.com/rs/jumio/images/Jumio%20-%20Mobile%20Consumer%20Habits%20Study-2.pdf...................................................................1

Jennifer Valentino-DeVries, *Sealed Court Files Obscure Rise in Electronic Surveillance*, Wall Street Journal, June 2, 2014…………………………………………………...………………25

Marc Rotenberg & Alan Butler, *Symposium: In* Riley v. California*, A Unanimous Supreme Court Sets Out Fourth Amendment for Digital Age*, SCOTUSblog (June 26, 2014, 6:07 PM), http://www.scotusblog.com/2014/06/symposium-in-riley-v-california-a-unanimous-supreme-court-sets-out-fourth-amendment-for-digital-age/…………………………………............…20

Thomas A. O'Malley, *Using Historical Cell Site Analysis Evidence in Criminal Trials*, U.S. Att'y Bull., Nov. 2011………………………………………………………………………….2

*U.S. and World Population Clock*, U.S. Census Bureau, http://www.census.gov/popclock/ ……2

**INTRODUCTION**

In *Riley v. California*, the Supreme Court noted that cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy."  134 S. Ct. 2473, 2484 (2014).  In addition to acting as cameras, phone books, maps, and computers, cell phones automatically generate a record of when and where they are used – effectively documenting the locations of all cell phone users, everywhere they go, every time of day.

In this case, the government is seeking to obtain the location information of cell phone users from their phone companies, without their consent and without showing probable cause or obtaining a warrant.  Magistrate Lloyd, relying on established Fourth Amendment principles, denied the government's application.  Recognizing that "cell site location information implicates a person's constitutional right to privacy," he held that the government cannot bypass the warrant requirement of the Fourth Amendment to obtain this information.  Order at 4.  In reaching this decision, the magistrate joined courts around the country, including this Court, that have recognized that individuals have a reasonable expectation of privacy in "all [cell phones] contain and all they may reveal," *Riley,* 134 S. Ct. at 2494, including what they reveal about the user's location.  This Court should affirm the magistrate's decision.

**BACKGROUND**

Ninety percent of American adults have a cell phone.[1]  Forty-one percent of U.S. households have *only* cell phones.[2]  As of December of 2013, there were 335.65 million wireless

---

[1] *Device Ownership Over Time*, Pew Research Internet Project, http://www.pewinternet.org/data-trend/mobile/device-ownership/ (last visited June 1, 2015).

[2] *Annual Wireless Industry Survey*, CTIA - The Wireless Association, http://www.ctia.org/your-wireless-life/how-wireless-works/annual-wireless-industry-survey (last visited June 1, 2015).

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

1

subscriber accounts in the United States,[3] a number that exceeds the total population.[4]  In 2013, American cell phone users generated 2.618 trillion minutes of calls and 1.91 trillion text messages.[5]  According to a recent survey, nearly three quarters of adults with smartphones reported being within five feet of their phones most of the time.[6]  Accordingly, people expect to be able to use their cell phones everywhere they go and, for the most part, they can.

Cell phones operate through the use of radio waves.  Cellular service providers maintain a network of radio base stations (also called cell sites or cell towers) throughout their coverage areas. *Electronic Communications Privacy Act (ECPA) (Part II): Geolocation Privacy and Surveillance, Hearing before the Subcomm. on Crime, Terrorism, Homeland Security, and Investigations, of the H. Comm. on the Judiciary*, 113th Cong., 50 (2013) (written testimony of Prof. Matt Blaze, University of Pennsylvania) [hereinafter 2013 ECPA Hearing].  A base station consists of multiple antennas facing in different directions.  Typically, there are three antennas, each covering a 120-degree arc, resulting in three pie-shaped sectors.  Thomas A. O'Malley, *Using Historical Cell Site Analysis Evidence in Criminal Trials*, U.S. Att'y Bull., Nov. 2011, at 19-20 [hereinafter O'Malley].

Cell phones periodically identify themselves to the closest base station (the one with the strongest radio signal) as they move throughout the coverage area.  2013 ECPA Hearing at 50 (Blaze testimony).  Whenever a cell phone user makes or receives a call or text message, his phone

---

[3] *Annual Wireless Industry Survey*, CTIA - The Wireless Association, http://www.ctia.org/your-wireless-life/how-wireless-works/annual-wireless-industry-survey (last visited June 1, 2015).

[4] *U.S. and World Population Clock*, U.S. Census Bureau, http://www.census.gov/popclock/ (last visited June 1, 2015) (listing population at 320.99 million).

[5] *Annual Wireless Industry Survey*, *supra* note 2.

[6] Harris Interactive, *2013 Mobile Consumer Habits Study*, Jumio, Inc., 2 (June 2013), http://pages.jumio.com/rs/jumio/images/Jumio%20-%20Mobile%20Consumer%20Habits%20Study-2.pdf

connects, via radio waves, to an antenna on a cell site, generating cell site location information ["CSLI"].  If a cell phone moves away from the base station with which it started a call and closer to another base station, it connects seamlessly to the next base station.  *Id.*

As the number of cell phones has increased, the number of cell sites has had to increase as well:

> A sector can handle only a limited number of simultaneous call connections given the amount of radio spectrum "bandwidth" allocated to the wireless carrier.  As the density of cellular users grows in a given area, the only way for a carrier to accommodate more customers is to divide the coverage area into smaller and smaller sectors, each served by its own base station and antenna. New services, such as 3G and LTE/4G Internet create additional pressure on the available spectrum bandwidth, usually requiring, again, that the area covered by each sector be made smaller and smaller.

*Id.* at 54.  Densely populated urban areas therefore have more towers covering smaller sectors. Within three miles of the San Jose Federal Courthouse, for example, there are 199 towers (with applications for three more currently pending) and 652 separate antennas.[7]  Within just one mile of the Federal Courthouse in New York City there are 118 towers and 1086 antennas.[8]

The trend is toward smaller and smaller base stations – called microcells, picocells, or femtocells – that cover a very specific area, such as one floor of a building, the waiting room of an office, or a single home.  *Id.* at 43-44.  The effect of this proliferation of base stations is that "knowing the identity of the base station (or sector ID) that handled a call is tantamount to knowing a phone's location to within a relatively small geographic area … sometimes effectively identifying individual floors and rooms within buildings."  *Id.* at 55-56.  Although the ability of

---

[7] Information regarding the concentration of towers in a given geographic area can be found on a public database, available at http://www.antennasearch.com/sitestart.asp (last visited June 1, 2015).

[8] *Id.*

1    cell providers to track a phone's location within a sector varies based on a number of factors, it is

2    increasingly possible to use CSLI to "calculate users' locations with a precision that approaches

3    that of GPS." *Id.* at 53.

4    Tools and techniques are continually being developed to track CSLI with ever-greater

5    precision. Providers currently can triangulate the location of a phone within a sector by correlating

6    the time and angle at which it connects with multiple base stations. *Id.* at 56. Providers are also

7    developing technologies that will track CSLI whenever a phone is turned on, whether or not it is

8    in use. *Id.* at 57. Because this information costs little to collect and store, providers tend to keep

9    it indefinitely. *Electronic Communications Privacy Act Reform and the Revolution in Location*

10   *Based Technologies and Services, Hearing before the Subcomm. on the Constitution, Civil Rights,*

11   *and Civil Liberties of the H. Comm. on the Judiciary*, 111th Cong., 16 (2010) (testimony of Prof.

12   Matt Blaze) [hereinafter 2010 ECPA Hearing].

13   The ability to track people through their cell phones is, obviously, very appealing to law

14   enforcement. *See* O'Malley, *supra*, at 26 (noting that provider records "contain accurate date,

15   time, and location information" and "unlike a witness' memory, are not prone to impeachment

16   based on their accuracy, reliability, or bias"); 2013 ECPA Hearing at 61 ("These characteristics –

17   ubiquitous and continuous availability, lack of alerting, and high precision – make network-based

18   cellular tracking an extremely attractive and powerful tool for law enforcement surveillance.").

19   Consequently, each year the United States government seeks CSLI for tens of thousands

20   of people. 2010 ECPA Hearing at 80 (written testimony of United States Magistrate Judge Stephen

21   Wm. Smith). The government almost always seeks this information by way of sealed applications

22   and orders. *Id.* at 87. In this district alone, the Office of the United States Attorney has identified

23   760 matters in its case management system that were likely to involve applications for location-

24

25   CR 15-XR-90304-HRL-1(LHK)
     Resp. to Govt. Appeal

4

tracking information between January 1, 2008, and January 3, 2013. Declaration of Patricia J. Kenney in Support of the Department of Justice's Motion for Summary Judgment as to Part 1 of Plaintiff's Freedom of Information Act Request at 10, *American Civil Liberties Union of Northern California v. Department of Justice*, No. 12-cv-4008 MEJ (N.D. Cal. Sept. 23, 2013).

**ARGUMENT**

**I.   THE FOURTH AMENDMENT PROHIBITS THE WARRANTLESS SEARCH AND SEIZURE OF CSLI**

**A.   CSLI Is Protected by the Fourth Amendment Right to Privacy**

The Fourth Amendment prohibits the government from collecting an individual's historical location tracking information without a warrant.  Since at least 1967, the Supreme Court has recognized that the Fourth Amendment protects an individual's right to privacy, even in public places.  *Katz v. United States*, 389 U.S. 347, 351 (1967).  *Katz* held that when the government infringes upon a subjective expectation of privacy that society recognizes as reasonable, it effects a search and seizure within the meaning of the Fourth Amendment.  *Id.* at 353.  Thus, in *Katz*, the government was found to have violated the defendant's Fourth Amendment rights by eavesdropping on his private conversation in a public phone booth.  *Id.*

In *United States v. Knotts*, the Court first applied the *Katz* test to electronic surveillance, holding that the Fourth Amendment was not violated when the government used a beeper to track a car.  460 U.S. 276, 277 (1983).  The beeper tracking in *Knotts* did not implicate the Fourth Amendment because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."  *Id.* at 281. However, the Court left open the possibility that advances in surveillance technology would require it to reevaluate its decision.  *Id.* at 283-84.

The following year, in *United States v. Karo*, the Court limited *Knotts* to electronic

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

5

surveillance *in public places*.  468 U.S. 705, 714 (1984).  In *Karo*, the police placed a beeper in a container belonging to the defendant and monitored its location electronically, including while it was inside a private residence.  *Id.* at 708-10.  The Court held that the monitoring of the beeper inside the home was an unconstitutional trespass into the residence by electronic means – even though the officers could not have known, when they planted the tracking device, that it would end up inside a house.  *Id.* at 715; *see also Kyllo v. United States*, 533 U.S. 27, 34 (2001) (holding that the government engages in a search in violation of the Fourth Amendment by using a thermal imager to detect heat signatures inside a house that would be invisible to the naked eye).

More recently, in *United States v. Jones*, five Justices concluded that prolonged electronic location monitoring by the government, even when it is limited to public locations, impinges upon a legitimate expectation of privacy in violation of the Fourth Amendment.  132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring); *id.* at 965 (Alito, J., concurring).  In *Jones*, the government placed a GPS tracker on the defendant's car and used it to monitor the car's location – on public thoroughfares – for 28 days.  *Id.* at 948.  The majority opinion held that the government had violated the Fourth Amendment by the physical trespass of placing the tracker on the vehicle, and it therefore did not need to address whether the location tracking violated a reasonable expectation of privacy.  *Id.* at 949.  It explicitly noted, however, that "[s]ituations involving merely the transmission of electronic signals without trespass would *remain* subject to *Katz* analysis."  *Id.* at 953 (emphasis in original).

The five Justices who did engage in a *Katz* analysis concluded that the government's actions in tracking the car's location violated the Fourth Amendment.  *Id.* at 955 (Sotomayor, J.,

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

6

concurring); *id.* at 964 (Alito, J., concurring).[9]  Although the government tracked the car only as it travelled in plain sight on public streets and highways, Justice Alito concluded that the GPS monitoring "involved a degree of intrusion that a reasonable person would not have anticipated." *Id.* at 964 (Alito, J., concurring).  Consequently, he found that "the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy."  *Id.*  Notably, this conclusion did not depend upon on the type of technology used to track the car in *Jones*; rather, Justice Alito discussed the proliferation of modern devices that track people's movements, noting that cell phones were "perhaps [the] most significant" among these.  *Id.* at 963 (Alito, J., concurring).

Justice Sotomayor agreed that prolonged electronic surveillance violates the Fourth Amendment.  *Id.* at 955 (Sotomayor, J., concurring).  She added, however, that "even short-term monitoring" raises concerns under *Katz* because "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."  *Id.*  When governmental actions intrude upon someone's privacy to that degree, a warrant is required.  *Id.*

Here, as in *Jones*, the government seeks permission to track individuals – without a warrant – over an extended period of time, by electronic means.[10]  CSLI, like GPS, provides the government with a comprehensive, intimate portrait of an individual's life.  Most people would

---

[9] Justice Sotomayor, while agreeing with Justices Alito, Ginsburg, Breyer, and Kagan that an analysis under *Katz* was appropriate, nonetheless wrote separately because she also joined the majority in concluding that the physical trespass of placing the tracker on the car was an independent Fourth Amendment violation.  *Jones*, 132 S. Ct. at 954-55 (Sotomayor, J., concurring).

[10] This Response addresses CSLI in general terms only, because no information was disclosed about the type of location information the government is seeking or the length of time covered by its application.

1    expect that the government would have to obtain a warrant in order to access records tracking their

2    movements for weeks or months at a time – and that expectation is a reasonable one.

3         In *United States v. Cooper*, this Court reached the same conclusion, holding that the

4    government must obtain a warrant based on probable cause to access historical CSLI records.  No.

5    13-00693 SI, 2015 WL 881578, at *8 (N.D. Cal. Mar. 2, 2015).  *Cooper* noted that the historical

6    CSLI obtained by the government was even more revealing – and thus more entitled to the

7    protection of the Fourth Amendment – than the GPS data at issue in *Jones*.  *Id.* at *7.  The Court

8    observed that cell phones, unlike cars, accompany their owners everywhere, not only to public

9    places.  CSLI is, therefore, "private in nature," so that even one point of location data implicates a

10   privacy right that is subject to Fourth Amendment protection. [11]  *Id.* at *7.

11        The ability of CSLI to track people inside buildings raises additional Fourth Amendment

12   concerns.  *Kyllo* and *Karo* prohibit warrantless intrusions into the home, intended or not, by

13   technological means.  *Kyllo*, 533 U.S. at 34; *Karo*, 468 U.S. at 17.  As the Court acknowledged in

14   *Kyllo*, "the rule we adopt must take account of more sophisticated systems that are already in use

15   or in development." *Kyllo*, 533 U.S. at 36.  Because CSLI is generated by radio waves, it inevitably

16   collects information from inside buildings, including private homes.  Especially as cell sites cover

17   smaller and smaller sectors, cell site location tracking to (or even within) a specific home is

18   inevitable.  Even today, the government has no way of restricting its requests for CSLI to public

19   spaces, which is one reason that governmental requests for this information should be supported

20

21   _____

[11] *Cooper* cited with approval the reasoning of *United States v. Davis*, 754 F.3d 1205 (11th Cir.
22   2014), *rev'd en banc*, ___ F.3d ___, 2015 WL 2058977 (11th Cir. May 5, 2015).  When Judge
     Illston issued her opinion in *Cooper*, *Davis* already had been vacated and re-hearing *en banc*
23   granted. Judge Illston did not cite *Davis* as precedent but, rather, wrote: "While the Ninth Circuit
     has yet to address this precise question, the Court finds no case which would foreclose adopting
24   the reasoning espoused in *Davis*." *Cooper*, 2015 WL 881578, at *7.

25

by probable cause and a warrant.

As noted above, the data the government seeks when it requests CSLI is much more comprehensive, and much more apt to reveal intimate information, than the location of someone's car.  Indeed, although people are in their cars only while travelling from one place to another, most Americans are within five feet of their cell phones most of the time.[12]  Especially in urban settings, where cell towers are more plentiful, a cell phone – and, by extension, its owner – can be tracked with disquieting precision.[13]

## II. Cell Phone Users Do Not Forfeit Their Fourth Amendment Rights Simply Because Their CSLI Records Are Maintained by Third-Party Cell Phone Providers

### A. An Individual Does Not Lose His Right to Privacy in CSLI Simply Because It Is Disclosed to a Cell Phone Provider

The government is incorrect to analogize the CSLI at issue here to the bank records and pen registers at issue in *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Miller*, 425 U.S. 435 (1976).  Appellant Br., 3-4.  *Smith* and *Miller* held that, by voluntarily sharing dialed numbers with the phone company and banking records with the bank, consumers waived any right to privacy in those records for purposes of the Fourth Amendment.  *Smith*, 442 U.S. at 742; *Miller*, 425 U.S. at 442-43.  The fact that cell phone providers maintain records of individuals' CSLI does

---

[12] Harris Interactive, *2013 Mobile Consumer Habits Study*, Jumio, Inc., 2 (June 2013), http://pages.jumio.com/rs/jumio/images/Jumio%20%20Mobile%20Consumer%20Habits%20Study-2.pdf (last viewed June 8, 2015).

[13] Even cases that disagree on the constitutionality of warrantless CSLI tracking acknowledge that the tracking is precise.  *See In the Matter of the Application*, 724 F.3d 600, 609 (5th Cir. 2013) ("The reason that the Government seeks such information is to locate or track a suspect in a criminal investigation. The data must be precise enough to be useful to the government… it can narrow someone's location to a fairly small area."); *see also* 2013 ECPA Hearing at 61 ("The increasingly high resolution that the cell site tracking can achieve in densely populated areas – and the ability to provide this data even when the handset is indoors – can paint an even richer picture of an individual's movements than can vehicle-based GPS devices.").

not, however, necessarily diminish the individuals' privacy interest in those records.

The third-party doctrine discussed in *Smith* and *Miller* is inapplicable in an era when people routinely and unthinkingly disclose the most intimate details of their lives to their cell phone providers. As Justice Sotomayor recognized in *Jones*, our increasing dependence on technology in daily life requires a reevaluation of the question of "privacy" in the context of the Fourth Amendment:

> More fundamentally, it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. *E.g., Smith,* 442 U.S. at 742, 99 S. Ct. 2577; *United States v. Miller,* 425 U.S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976). This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.

132 S. Ct. at 957 (Sotomayor, J., concurring); *see also* Aya Gruber, *Garbage Pails and Puppy Dog Tails: Is That What* Katz *Is Made Of?*, 41 U.C. Davis L. Rev. 781 (2008) (arguing that the third-party doctrine is "extremely dangerous in an increasingly technological world" and must be reconsidered in light of actual societal expectations of privacy in digital information).

The Supreme Court has consistently revisited its Fourth Amendment jurisprudence in light of evolving technology. *See Kyllo*, 533 U.S. at 33-34 ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology."). *Jones* thus recognized that GPS technology was qualitatively different from its physical surveillance counterpart.[14] 132 S. Ct. at 954. *Riley* similarly rejected

---

[14] Even the *Knotts* Court acknowledged that its analysis was subject to change with evolving surveillance technology. 460 U.S. at 283-84 ("If such dragnet type law enforcement practices as

any comparison between other physical items in an arrestee's possession and his cell phone.  *See* 134 S. Ct. at 2485 ("A search of the information on a cell phone bears little resemblance to the type of brief physical search considered in [*United States v. Robinson*, 414 U.S. 218 (1973)]").

Here, as in *Jones* and *Riley*, the realities of modern technology preclude the mechanical application of 35-year-old precedent.  In 1979, the year *Smith* was decided, Jimmy Carter was president, *The Dukes of Hazard* premiered on CBS, and telephones travelled only as far as their cords would allow.  The Court could not have foreseen that one day the telephone company would be automatically electronically tracking the vast majority of Americans everywhere, all the time, and regularly turning that information over to the government.  It is inconceivable that the Supreme Court in *Smith* and *Miller* intended so far-reaching an abrogation of our Fourth Amendment rights.[15]  *See Cooper*, 2015 WL 881578, at *6 ("[T]he pen registers employed in 1979 bear little resemblance to their modern day counterparts. . . . Therefore *Smith* does not answer the question of whether persons who place a call have a reasonable expectation of privacy in their location as conveyed by historical cell site data.").

---

respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable."); *see also United States v. Pineda-Moreno*, 617 F.3d 1120, 1126 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing *en banc*) ("When requests for cell phone location information have become so numerous that the telephone company must develop a self-service website so that law enforcement agents can retrieve user data from the comfort of their desks, we can safely say that 'such dragnet-type law enforcement practices' are already in use.").

[15] Indeed, although the government's concession in *Riley* that a search had occurred enabled the Court to avoid fully reconsidering *Smith*, the Court took the opportunity to explain that the pen register in *Smith* bore little relationship to the cell phone data being mined by the government. *Riley*, 134 S. Ct. at 2492.  The Court noted that the call log (and thus metadata) of even an old-fashioned flip phone "contained more than just phone numbers," including substantial personal identifiers, rendering a case about pen registers of little utility in deciding the Fourth Amendment question in the context of cell phones.  *Id.* at 2493.

The advent of technologies that enable more intrusive police surveillance cannot be permitted to "erode the privacy guaranteed by the Fourth Amendment." *Kyllo*, 533 U.S. at 34. This Court should join Judge Illston in rejecting "the fiction that the vast majority of the American population consents to warrantless government access to the records of a significant share of their movements by 'choosing' to carry a cell phone." *In the Matter of an Application*, 809 F. Supp. 2d 113, 127 (E.D. N.Y. 2011); *see also Cooper,* 2015 WL 881578, at *8 ("Technological advances, coupled with declining cost, have rendered cell phones ubiquitous, and for many, an indispensable gizmo to navigate the social, economic, cultural and professional realms of modern society.").

### B. Cell Phone Users Do Not Voluntarily Convey CSLI to a Third Party

Even under the third-party doctrine articulated in *Smith* and *Miller*, however*,* cell phone users would retain a constitutionally protected privacy interest in their CSLI. *Smith* held that there was no privacy interest in dialed numbers because the person using the telephone intentionally conveyed the number to the telephone company for the express purpose of having the carrier connect him to that number. 442 U.S. at 742. The consumer also received a list of numbers dialed on his monthly bill, confirming that the phone company was recording this information. *Id.* Similarly, *Miller* declined to extend Fourth Amendment protection to bank documents (*e.g.*, checks, deposit slips) because the consumer intentionally shared these documents with bank employees in order to achieve his purpose (*e.g.*, transferring money to another entity, depositing money in an account) and the bank was a party to these transactions. 425 U.S. at 440-43.

CSLI, on the other hand, is not knowingly and intentionally conveyed by the cell phone user to anyone but rather generated automatically by radio waves. People do not use their cell phones as tracking devices or expect that the government will do so. In contrast to *Smith*-era telephone bills, which listed toll calls, cell phone bills do not report CSLI. Nor do providers inform

users how long they retain CSLI.  Cell phone users do not affirmatively convey CSLI, nor can they control its disclosure.  Accordingly, the Third Circuit has rejected the argument that CSLI is voluntarily conveyed by cell phone users.  *In the Matter of the Application*, 620 F.3d 304, 317 (3d Cir. 2010).  Judge Illston echoed this concern in *Cooper*:

> Cell phone users may assume that the numbers they dial will be transmitted to the phone company, thus defeating any reasonable expectation of privacy. However, "there is no indication to the user that making that call will also locate the caller; when a cell phone user receives a call, he hasn't voluntarily exposed anything at all."

2015 WL 881578, at *8 (quoting *In the Matter of the Application*, 620 F.3d at 317-18).

The Ninth Circuit has also rejected the general theory that passive transmission of data to a third party waives a consumer's Fourth Amendment rights.  In *United States v. Forrester*, the court held that email addresses and IP addresses were not protected by the Fourth Amendment. 512 F.3d 500, 510 (9th Cir. 2008).  Significantly, the court drew a distinction between this information, which the consumer conveys intentionally for purposes of delivering his email or directing his browser to a specific location on the internet, and data that is "merely passively conveyed through third party equipment."  *Id.*  The court retained Fourth Amendment protection for information that is not conveyed voluntarily to achieve a purpose of the consumer.  *Id.* at 511 ("E-mail, like physical mail, has an outside address 'visible' to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient."); *see also Cooper*, 2015 WL 881578, at *7 (noting that the Ninth Circuit's decision in *Forrester* is consistent with its own holding that the Fourth Amendment protects historical CSLI).

Even the *Smith* Court recognized that the voluntary disclosure of information to a third

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

13

party does not erase all Fourth Amendment protection.[16]  442 U.S. at 739-40.  *Smith* distinguished between records of dialed telephone numbers and the content of telephone conversations, which it acknowledged remained protected by the Fourth Amendment.  *Id.*  The location information at issue here is more analogous to the content of a communication than to an address.  Tracking a person via the location of his cell phone is akin to electronically following him everywhere he goes, inside and outside, day and night, for the period of surveillance.  This is far more intrusive than recording the phone numbers he dials, and it warrants greater Fourth Amendment protection.

### C.  A Service Provider's Ability to Access CSLI in the Course of Business Does Not Defeat the Subscriber's Reasonable Expectation of Privacy

The government argues that it may obtain CSLI because "a historical cell site record 'is clearly a business record' of the cell phone provider," Appellant Br., 6 (quoting *In the Matter of the Application*, 724 F.3d 600, 612 (5th Cir. 2013)), and, as such, may be obtained by subpoena or similar compulsory process.  The government contends that it need not, therefore, establish probable cause before acquiring CSLI and need only satisfy the Fourth Amendment's "reasonableness standard for compulsory process."  *Id.*

The fundamental flaw in this argument is that it begs the critical question of whether cell phone users have a reasonable expectation of privacy in their location information.  *See Smith*, 442 U.S. at 742 ("petitioner's argument that [the pen register] installation and use constituted a 'search' necessarily rests upon a claim that he had a 'legitimate expectation of privacy' regarding the numbers he dialed on his phone"); *Miller*, 425 U.S. at 442 ("We must examine the nature of the

---

[16] Even if disclosure to a third party diminishes an individual's privacy interest, *Riley* explicitly held that "diminished privacy interests [do] not mean that the Fourth Amendment falls out of the picture entirely." 134 S. Ct. at 2488.  "To the contrary, when 'privacy-related concerns are weighty enough' a 'search may require a warrant notwithstanding the diminished expectations of privacy.'" *Id.* (quoting *Maryland v. King*, 133 S. Ct. 1958, 1979 (2013)).

particular documents sought to be protected in order to determine whether there is a legitimate 'expectation of privacy' concerning their contents."). If a reasonable expectation of privacy exists, the fact that the record is maintained in the course of business does not strip it of Fourth Amendment protection.

As discussed above, cell phone users do have a reasonable expectation of privacy in their CSLI. Therefore, the government cannot obtain it simply by issuing a subpoena. *See Miller*, 425 U.S. at 444 ("[T]he general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant" applies only when "no Fourth Amendment interests… are implicated.").

A second flaw in the government's argument is that cell phone users do not knowingly and voluntarily convey their location information to the cell phone provider. The voluntariness question is significant in the business records analysis. *See Smith*, 442 U.S. at 445 (stating that it does not matter "whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed" but rather whether "petitioner voluntarily conveyed to it information that it had facilities for recording and that it was free to record"). Consequently, the Third Circuit considered whether cell phone users voluntarily share their location information with their carriers and concluded that they do not. *In the Matter of the Application*, 620 F.3d at 317 ("A cell phone customer has not 'voluntarily' shared his location information with a cell provider in any meaningful way.").[17]

---

[17] Other cases that the government cites to support this claim also fail to advance its argument. In *Donaldson v. United States*, 400 U.S. 517 (1971), and *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984), the Court found no reasonable expectation of privacy because people had intentionally disclosed the information at issue to someone else. Similarly, in *United States v. Golden Valley Elec. Ass'n*, the reasonableness standard applied because the records at issue were ones in which the consumer had no reasonable expectation of privacy. 689 F.3d 1108, 1116—17 (9th Cir. 2012).

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

15

Once a subscriber has demonstrated a reasonable expectation of privacy in records held by a third party, the question becomes whether the disclosure or some other factor defeats the Fourth Amendment protection otherwise accorded to the records.  In *United States v. Warshak*, the Sixth Circuit rejected the argument that an internet service provider's ability and right to access the contents of a subscriber's emails eliminated the subscriber's reasonable expectation of privacy in his emails.  631 F.3d 266, 286-87 (6th Cir. 2010).  The court held that the provider's control over and ability to access the emails "will not be enough to overcome an expectation of privacy."  *Id.* at 287 (internal quotation marks omitted).  There is no reason the Court should reach a different conclusion in this case.

Finally, whether or not the government mandates cell phone providers to keep CSLI is not dispositive of the Fourth Amendment question.  The Supreme Court explicitly did not rely on a governmental record-keeping mandate either in *Miller*, in which the banks were required by federal law to keep the records at issue, or in *Smith*, in which the telephone company was not.  *See Smith* 442 U.S. at 745 ("[T]he fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed does not, in our view, make any constitutional difference."); *Miller*, 425 U.S. at 443 (noting that significant issue is whether bank depositor risks disclosure by sharing information; "This analysis is not changed by the mandate of the Bank Secrecy Act that records of depositors' transactions be maintained by banks.").  Similarly, the relevant government conduct here is not whether it mandated that cell providers keep CSLI records but, rather, the fact that it obtained location information in which cell phone users have a reasonable expectation of privacy.  *See Warshak*, 631 F.3d at 286 ("if government agents compel an ISP to surrender the contents of a subscriber's emails, those agents have thereby conducted a Fourth Amendment search, which necessitates compliance with the warrant

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

requirement absent some exception.").[18]

### III. THE ELEVENTH AND FIFTH CIRCUITS ERRED IN CONCLUDING THAT SUBSCRIBERS HAVE NO CONSTITUTIONALLY PROTECTED PRIVACY INTEREST IN THEIR CSLI

The government urges this Court to follow the Eleventh and Fifth circuits in holding that the government need not procure a warrant before acquiring CSLI.  Appellant Suppl. Br.; *see U.S. v. Davis*, __ F.3d __, 2015 WL 2058977 (11th Cir. 2015) (*en banc*); *In the Matter of the Application*, 724 F.3d 600.  Both opinions were premised on the erroneous assertion that CSLI constitutes business records of the provider in which subscribers have no privacy interest.  *Davis*, 2015 WL 2058977 at *8; *In the Matter of the Application*, 724 F.3d at 611.  As discussed in Section II(C), above, this position ignores the fundamental question of whether cell phone users have a privacy interest in their CSLI in the first place.  If the answer to that question is yes, as it must be, the fact that the record is maintained in the course of business does not deprive it of Fourth Amendment protection.  *See Smith*, 442 U.S. at 742; *Miller*, 425 U.S. at 442.

The Eleventh and Fifth circuits were also incorrect about the voluntariness of consumers' transmission of CSLI.  *Davis*, 2015 WL 2058977 at *11; *In the Matter of the Application*, 724 F.3d at 312-13.  For the reasons discussed above, this Court should adopt *Cooper's* holding that CSLI is not transmitted voluntarily by the subscriber.  *Cooper*, 2015 WL 881578, at *8; *see also In the*

---

[18] In support of its argument that CSLI is a business record of the provider that may be obtained via subpoena, the government cites Justice Alito's concurrence in *Jones* with the parenthetical, "government has not 'required or persuaded' providers to keep historical cell site records." Appellant Br., 6 (citing *Jones*, 132 S. Ct. at 961 (Alito, J., concurring)).  The phrase the government cites was, however, a part of a hypothetical Justice Alito posed in his critique of the majority's reliance on the trespass theory to decide the case; it had nothing to do with CSLI.  *See Jones*, 132 S. Ct. at 961 (Alito, J., concurring) ("By contrast, if long-term monitoring can be accomplished without committing a technical trespass – suppose, for example, that the Federal Government required or persuaded auto manufacturers to include a GPS tracking device in every car – the Court's theory would provide no protection.").  It thus does not support an argument that the presence – or absence – of governmental record-keeping compulsion determines a person's Fourth Amendment rights.

1   *Matter of Application*, 620 F.3d at 317 ("A cell phone customer has not 'voluntarily' shared his

2   location information with a cell provider in any meaningful way.").

3         Moreover, contrary to *Davis* and *In the Matter of the Application*, the Supreme Court and

4   the Ninth Circuit have consistently held that exposing information to a third party does not

5   automatically waive one's expectation of privacy and attendant Fourth Amendment protections.

6   *See Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001) (holding that patients had reasonable

7   expectation of privacy in results of medical tests, despite their voluntary disclosure of those results

8   to hospital personnel); *Bond v. United States*, 529 U.S. 334, 338-39 (2000) (holding that traveler

9   retained reasonable expectation of privacy in bag placed in overhead bin of a bus, despite

10   knowledge that other passengers can handle and move bag); *Quon v. Arch Wireless Operating Co.,*

11   *Inc.*, 529 F.3d 892, 905-07 (9th Cir. 2008) (holding that police officer had reasonable expectation

12   of privacy in contents of text messages sent on phone owned by police department despite fact that

13   third-party server had access to the messages *and* despite department policy stating there was no

14   expectation of privacy in texts), *rev'd on other grounds*, 560 U.S. 746 (2010));, 392 U.S. 364, 369-

15   70 (1968) (holding that union officer had reasonable expectation of privacy in office and records

16   he shared with other union officers); *United States v. Taketa*, 923 F.2d 665, 677 (9th Cir. 1991)

17   (holding that agent had reasonable expectation of privacy in not being secretly videotaped in

18   someone else's office.  Thus, even if subscribers are aware that their location is being transmitted

19   to their provider, they retain an expectation of privacy in that information.

20         Finally, *Davis* misconstrued the concurring opinions in *Jones*.  Justice Alito did not, as

21   *Davis* claimed, speak "only at a high level of abstraction about the government's placement and

22   control of an electronic GPS mechanism on a private vehicle."  *Davis*, 2015 WL 2058977, at *15.

23   Rather, Justice Alito clearly articulated that the Fourth Amendment is violated by long-term

24

25   CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

monitoring of individuals' locations in public places:

> But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.

*Jones*, 132 S. Ct. at 964 (Alito, J., concurring). Justice Sotomayor was equally clear: "I agree with Justice ALITO that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy'"; but she went further, articulating a concern that "even short-term monitoring," raises concerns under *Katz*. *Id.* at 955 (Sotomayor, J., concurring); *see also A.C.L.U. v. Clapper*, __ F.3d __, 2015 WL 2097814, at *30 (2nd Cir. May 7, 2015) (noting that five justices "appeared to suggest that there might be a Fourth Amendment violation even without the technical trespass"); *Cooper,* 2015 WL 881578, at *6-7 ("The Sotomayor and Alito concurrences implicitly adopt the reasoning of the lower court, which held that although Jones' movements were publicly visible, 'the whole of one's movements is not exposed *constructively* even though each individual movement is exposed, because that whole reveals more — sometimes a great deal more — than does the sum of its parts.'" (quoting *United States v. Maynard*, 615 F.3d 544, 558 (D.C. Cir. 2010) (emphasis in original)).

Fundamentally, both the Eleventh Circuit and the Fifth posit that it is reasonable – and constitutional – to force people to choose between preserving their Fourth Amendment rights and using a cell phone. *Davis*, 2015 WL 2058977, at *12; *In the Matter of the Application*, 724 F.3d at 613. The Supreme Court has never, however, taken such an extreme position. As discussed above, the Court has repeatedly acknowledged that courts must take into account current and prospective technological capabilities when determining the proper scope of constitutional protection. *Riley*, 134 S. Ct. at 2488; *Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring); *id* at

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

19

963 (Alito, J., concurring); *Kyllo*, 533 U.S. at 36; *Knotts*, 460 U.S. at 283-84.  Doing so in this case compels the conclusion that the government must get a warrant to obtain CSLI.

## IV.   *RILEY* IMPLICITLY RECOGNIZES A PRIVACY INTEREST IN CSLI

After *Riley*, there is no doubt that individuals have a reasonable expectation of privacy in cell phone location data.  In a rare, unanimous Fourth Amendment decision, the Court explained that cell phones "hold for many Americans the privacies of life." *Riley*, 134 S. Ct. at 2495 (citation and internal quotation marks omitted).  *Riley*'s focus on the wealth of information revealed by an individual's cell phone, and the attendant right to privacy in that information, applies beyond the limited context of searches incident to arrest.[19]

Because cell phones have the capacity to expose such vast amounts of personal information about their owners, the Court refused to engage in a "mechanical application" of precedent.  *Id.* at 2484.  *Riley* thus rejected the government's efforts to analogize cell phone information to any pre-digital counterpart.  *See id.* at 2488 ("The United States asserts that a search of all data stored on a cell phone is 'materially indistinguishable' from searches of these sorts of physical items.  That is like saying a ride on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together.").  The

---

[19] Commentators agree that *Riley*'s holding extends well beyond the particular warrant exception at issue. Legal scholars have widely characterized the holding as sweeping, and one that will have broad implications in other areas. *See, e.g.*, Marc Rotenberg & Alan Butler, *Symposium: In* Riley v. California*, A Unanimous Supreme Court Sets Out Fourth Amendment for Digital Age*, SCOTUSblog (June 26, 2014, 6:07 PM), http://www.scotusblog.com/2014/06/symposium-in-riley-v-california-a-unanimous-supreme-court-sets-out-fourth-amendment-for-digital-age/ ("The Court's conclusion that *data is different* will affect not only digital search cases, but also the NSA's bulk record collection program, access to cloud-based data, and the third-party doctrine."); Adam Liptak, *Major Ruling Shields Privacy of Cellphones*, N.Y. Times (June 25, 2014), http://www.nytimes.com/2014/06/26/us/supreme-court-cellphones-search-privacy.html ("While the decision will offer protection to the 12 million people arrested every year, many for minor crimes, its impact will most likely be much broader.").

Court declared, without qualification, that "[m]odern cell phones, *as a category*, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 2488-89 (emphasis added).

Historical location data generated by cell phones served as one of the Court's chief examples of "the privacies of life" that cell phone metadata exposes. *See id.* at 2490 ("Data on a cell phone can also reveal where a person has been. Historic location information… can reconstruct someone's specific movements down to the minute, not only around town, but within a particular building.").  The Court cited with approval Justice Sotomayor's concurrence in *Jones*, in which she concluded that generating and monitoring "a precise, comprehensive record of a person's public movements" infringes upon a reasonable expectation of privacy that is protected by the Fourth Amendment. *Id.* (citing *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring)).

*Riley* also contained echoes of the "mosaic theory" of privacy adopted by Justices Sotomayor and Alito in their *Jones* concurrences, noting that "[a] cell phone collects in one place many distinct types of information… that reveal much more in combination than any isolated record." *Id.* at 2489.[20]  The Court explained that aggregating, then analyzing, this data intrudes upon a protected privacy interest: "The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." *Id.*

*Riley* thus stands in direct opposition to the Eleventh and Fifth Circuit decisions.  Cell phones, as the *Riley* court acknowledged, are ubiquitous.  *See* 134 S. Ct. at 2490 ("According to one poll, nearly three-quarters of smart phone users report being within five feet of their phones

---

[20] *See also, e.g., United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) (adopting, in lower court opinion in *Jones*, the "mosaic" theory to hold that GPS tracking of a car is a "search").

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

21

most of the time, with 12% admitting that they even use their phones in the shower.").  The data

they collect is "qualitatively different" than that contained in other objects, for purposes of Fourth

Amendment analysis.  *Id.  Riley's* discussion of the nature of cell phones and our dependence upon

them forecloses any argument that it is "reasonable" to expect that the 90% of American adults

who carry cell phones thereby waive their Fourth Amendment right to not be subject to constant

government surveillance.

## V. REQUIRING A WARRANT AND PROBABLE CAUSE BEFORE ALLOWING THE GOVERNMENT TO ACCESS CSLI IS CONSISTENT WITH THE SCA

The government argues that Congress determined that it could obtain CSLI based on only

a court order, without showing probable cause, when it enacted the Stored Communications Act

["SCA"], including 18 U.S.C. § 2703(d).[21]  Because CSLI is protected by the Fourth Amendment,

as discussed above, a warrant supported by probable cause is required, and the government may

not obtain CSLI based on a lesser showing, even if it complies with the statute.  "It is clear, of

course, that no Act of Congress can authorize a violation of the Constitution."  *Almeida-Sanchez*

*v. United States*, 413 U.S. 266, 272 (1973).

However, the Court need not find the SCA unconstitutional in order to hold that the Fourth

Amendment requires the government to get a warrant based on probable cause to obtain CSLI.

Other courts have interpreted the SCA to protect cell phone subscribers' reasonable expectation of

privacy in their CSLI without striking down the statute.  This Court can and should do the same.[22]

---

[21] *See* Appellant Br., 8 ("In the Stored Communications Act, including § 2703(d), Congress has enacted legislation controlling government access to historical records of cell-phone providers. When the government seeks historical cell site records using a § 2703(d) order, it complies with this statute.").

[22] The Supreme Court now has before it the question whether statutes may be challenged on their face under the Fourth Amendment.  *See Patel v. City of Los Angeles*, 738 F.3d 1058 (9th Cir. 2013) (en banc) (holding that city ordinance allowing warrantless inspection of city-mandated motel-

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

22

1

**A.      The Stored Communications Act Did Not Contemplate CSLI**

2      There is no indication in the SCA or the relevant legislative history that Congress

3  considered, or intended to address, CSLI in promulgating the SCA.  *See In re United States*, 441

4  F. Supp. 2d 816, 833 (S.D. Tex. 2006) ("Hybrid proponents concede that the SCA was not

5  specifically enacted as the mechanism to collect cell site data.").  The legislative history of the

6  SCA establishes that Congress enacted it primarily to "'protect against the unauthorized

7  interception of electronic communications.'"  *In the Matter of the Application*, 620 F.3d at 313

8  (quoting S. Rep. No. 99-541, at 1 (1986)).  Although the legislative history refers to cell phones,

9  it discusses location information only with respect to "tracking devices" or transponders, which it

10  defines as "one-way radio communication devices that emit a signal on a specific radio frequency"

11  – not cell phones.  S. Rep. No. 99-541 at, *e.g.*, 2, 4, 9, 10.  The section describing "cellular

12  telephones" does not mention location information.  *Id.* at *9.

13      The most recent amendment to the SCA, by CALEA in 1994, addressed CSLI only by

14  precluding the government from obtaining it based solely on a pen register application.  *In the*

15  *Matter of the Application*, 620 F.3d at 315 n.1 (quoting 47 U.S.C. § 1002(a)(2)(B)); *see also* 2010

16  ECPA Hearing at 2 (2010) (Rep. Sensenbrenner:  "In enacting…CALEA, Congress specifically

17  instructed that a person's location information cannot be acquired solely pursuant to a pen

18  register.").  In fact, Congress held a series of hearings in 2010 to address CSLI precisely because

19  it had not considered the subject when it enacted or amended the SCA.  *See* 2010 ECPA Hearing

20  at 2 (Rep. Sensenbrenner: "Considering that the ECPA was enacted in 1986, well before the

21  proliferation of cell phones and other technologies, I think it is fair to say that the statute does not

22

23

_____

guest-registration information was facially invalid under the Fourth Amendment), *cert. granted*,
135 S. Ct. 400 (2014) (No. 13-1175) (argued Mar. 3, 2015).

24

25  CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

23

1   speak specifically to these issues."); *id.* at 82 (Magistrate Smith: "ECPA does not explicitly refer

2   to 'cell site' or other location information from a cell phone.").

3       A review of the explosive growth in cell site networks and the proliferation of cell phones

4   over the past 29 years further belies any claim that the 1986 SCA adequately protects cell phone

5   users' privacy interests when the government seeks CSLI today.  Indeed, that is one of the reasons

6   the 2010 hearing was necessary:

7           [M]obile communication devices have evolved from being little
            more than a convenience for the wealthy to a basic necessity for
8           most Americans.  Cell phones have transformed the way we
            communicate and work with each other on a daily basis…
9           According to a 2009 Wireless Association report, there were
            approximately 227 million cell phone services subscribers in the
10          United States last year.  That is about 90 percent of the overall
            population.

11

12  *Id.* at 3-4 (Rep. Johnson); *see also id.* at 3 (Rep. Sensenbrenner: "I think we all know that a 24-

13  year-old original law and a 16-year-old second law is way out of date compared to where the

    technology is at.").

14

15      When the SCA was passed in 1986, there were only 1,000 cell sites in the United States,

16  and fewer than 1% of Americans used cell phones.[23]  When the SCA was amended in 1994, fewer

17  than 10% of Americans used cell phones.[24]  Today, more than 90% of American adults have one.

18  The increase in the number of cell phones and the uses to which they are put have  driven a

19  corresponding increase in the number of base stations, which means CSLI is much more accurate

20  now than it was in 1986 and 1994.  2013 ECPA Hearing at 43 (Blaze testimony).  Modern

21

22  [23] Andrea Meyer, 30th Anniversary of the First Commercial Cell Phone Call, Verizon Wireless
    News Center, (October 11, 2013), http://www.verizonwireless.com/news/article/2013/10/30th-
23  anniversary-cell-phone.html.
    [24] Andrew Kupfer, AT&T's $12 Billion Cellular Dream, Fortune, Dec. 12, 1994, at 110, available
24  at http://archive.fortune.com/magazines/fortune/fortune_archive/1994/12/12/80051/index.htm.

25  CR 15-XR-90304-HRL-1(LHK)
    Resp. to Govt. Appeal
                                        24

technology allows a cell phone's location to be identified with accuracy close to that of GPS. [25] *Id.* at 56 (Blaze written remarks).

Federal and local law enforcement agencies have taken advantage of the proliferation of cell phones and cell networks, seeking CSLI in more than a million cases a year.[26] The government has sought CSLI almost always in secret and almost always without a warrant, as in this case. *See, e.g.*, 2010 ECPA Hearing at 77 (testimony of Magistrate Smith referring to "regime of secrecy"); Jennifer Valentino-DeVries, *Sealed Court Files Obscure Rise in Electronic Surveillance*, Wall Street Journal, June 2, 2014[27] (discussing indefinite sealing of most government non-warrant requests for electronic surveillance, including CSLI).

The SCA was not enacted – or amended – to address the proliferation of government requests for CSLI.  Since its passage (29 years ago) and most recent amendment (21 years ago), there have been tremendous technological advances in the accuracy of location information.  That, along with the widespread dependence on cell phones for an ever-increasing number of

---

[25] FCC regulations require cell phone carriers to provide increasingly accurate location information. *See* 47 C.F.R. § 20.18(h) (setting standards for carriers' ability to locate phones within as little as 100 meters for "network based" calls and as little as 50 meters for "hand-set" based calls for increasingly large percentages of their networks between 2012 and 2019); *see also In the Matter of the Application*, 620 F.3d at 318 (noting FCC regulation).

[26] According to responses from eight providers to an inquiry from Senator Markey, law enforcement agencies requested "personal mobile phone data" for Americans more than one million times in 2012.  For Second Year in a Row, Markey Investigation Reveals more than One Million Requests by Law Enforcement for Americans Mobile Phone Data, Press Release from Ed Markey, (December 9, 2013) available at: http://www.markey.senate.gov/news/press-releases/for-second-year-in-a-row-markey-investigation-reveals-more-than-one-million-requests-by-law-enforcement-for-americans-mobile-phone-data; *see also* 2010 ECPA Hearing at 76, 80 (testimony of Magistrate Smith, estimating that "the total number of electronic surveillance orders issued at the federal level each year substantially exceeds 10,000.").  As noted above, in this district alone, the government has identified 760 matters that likely involved applications for location-tracking information from 2008 through 2012.

[27] Available at http://online.wsj.com/articles/sealed-court-files-obscure-rise-in-electronic-surveillance-1401761770.

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

25

1  professional and personal activities and the government's relentless pursuit of location information,

2  requires at least a new assessment of the interests at stake in allowing the government routinely to

3  obtain CSLI without a warrant.

4       Against this backdrop, the Court in *Cooper* rejected the government's warrantless

5  obtaining of CSLI but explicitly did not hold the SCA unconstitutional.

> To be clear, the SCA makes no mention of cell site data, but rather
> speaks in general terms of "records concerning electronic
> communication."  As a matter of statutory construction, it is
> axiomatic that "where an otherwise acceptable construction of a
> statute would raise serious constitutional problems, the Court will
> construe the statute to avoid such problems unless such construction
> is plainly contrary to the intent of Congress." … Accordingly, the
> Court does not find the SCA to be constitutionally deficient.  Rather,
> the Court assumes, as it must, that Congress could not have intended
> the SCA to be used to obtain constitutionally protected information
> absent a showing of probable cause.

12  *Cooper*, 2015 WL 881578, at *8 (citation omitted).  Other judges as well, including the magistrate

13  below, have concluded that the Fourth Amendment prohibits the government from obtaining

14  historical CSLI absent a warrant – without declaring the SCA unconstitutional.  *See Davis*, 2015

15  WL 2058977, at *29, 34, 36, 40 (Martin, J., dissenting); *United States v. Davis*, 754 F.3d 1205,

16  1217 (11th Cir. 2014), *rev'd en banc* 2015 WL 2058977; *see also Davis*, 2015 WL 2058977, at *5

17  (noting that defendant challenged constitutionality of SCA "as applied"); *In the Matter of the*

18  *Application*, 724 F.3d at 616 ("This appeal properly turns on construction of a statute, rather than

19  on interpretation of the Fourth Amendment."); Order, No. CR 15-90304 MISC (HRL) at 4-5 (N.D.

20  Cal. Apr. 9, 2015) (noting that SCA "created two different paths" for government to get stored

21  electronic information from a service provider, search warrant and court order, and government

22  must get warrant for CSLI); *cf. Clapper*, 2015 WL 2097814, at *1 (holding that bulk telephone

23  metadata collection "exceeds the scope of what Congress has authorized" in the Patriot Act but

24

25  CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

1    not reaching constitutional arguments).  *But see Warshak*, 631 F.3d at 282 ("to the extent that the

2    SCA purports to permit the government to obtain such emails warrantlessly, the SCA is

3    unconstitutional.").

4    **B.      The SCA Gives Magistrates Discretion to Require a Warrant for CSLI**

5            The SCA also may be construed consistently with the Fourth Amendment because, by its

6    terms, it gives magistrate judges discretion to require the government to establish probable cause

7    supporting a warrant before they authorize the disclosure of CSLI.  *See In the Matter of the*

8    *Application*, 620 F.3d at 319 ("the statute as presently written gives the [magistrate] the option to

9    require a warrant showing probable cause.").   When faced with a question of statutory

10   interpretation, courts must rely on "[a]nalysis of the statutory text, aided by established principles

11   of interpretation."  *POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014).  "'If the

12   plain meaning of the statute is unambiguous, that meaning is controlling.'"  *United States v.*

13   *Johnson*, 680 F.3d 1140, 1144 (9th Cir. 2012) (quoting *United States v. Williams*, 659 F.3d 1223,

14   1225 (9th Cir. 2011) (ellipses omitted)).

15          The SCA sets forth procedures by which the government can obtain both content and

16   subscriber information from a cell phone service provider.  18 U.S.C. § 2703(a), (b), (c).  The

17   government generally may obtain non-content information without the customer's consent "only

18   when the governmental entity – (A) obtains a warrant issued using the procedures described in the

19   Federal Rules of Criminal Procedure…; [or] (B) obtains a court order for such disclosure under

20   subsection (d) of this section."  18 U.S.C. § 2703(c).

21          Subsection (d) states,

22              [a] court order for disclosure under subsection (b) or (c) *may be*
                *issued* by any court that is a court of competent jurisdiction and *shall*
23              *issue only if* the governmental entity offers specific and articulable
                facts showing that there are reasonable grounds to believe that the

24

25   CR 15-XR-90304-HRL-1(LHK)
     Resp. to Govt. Appeal
                                          27

1    contents of a wire or electronic communication, or the records or
2    other information sought, are relevant and material to an ongoing
     criminal investigation.

3    18 U.S.C. § 2703(d) (emphases added). "May be issued" is "the language of permission, rather

4    than mandate." *In the Matter of the Application*, 620 F.3d at 315. Accordingly, the Third Circuit

5    held, the plain language of § 2703 gives magistrates the discretion to require the government to

6    show probable cause supporting a warrant to obtain CSLI.[28] *See id.* at 319 ("If Congress wished

7    that courts 'shall,' rather than 'may,' issue § 2703(d) orders whenever the intermediate standard is

8    met, Congress could easily have said so.").

9        "At the very least, the use of 'may issue' strongly implies court discretion, an implication

10   bolstered by the subsequent use of the phrase 'only if' in the same sentence." *Id.* at 315. The

11   phrase "only if" indicates that the showing is "a *necessary*, but not a *sufficient*, condition" for

12   issuance of the order. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991) (analyzing phrase in

13   contest of the *Mendenhall* test for determining whether a person has been seized; emphases in

14   original). In other words, § 2703(d) does not require the magistrate to issue the CSLI disclosure

15   order even if the government makes the required showing. S*ee In the Matter of the Application*,

16   724 F.3d at 619 (Dennis, J., dissenting) ("The best plain reading of this language is simply that an

17   order *may not issue unless* the standard is met… nowhere does the statute by its terms *require* a

18

19

20   ---

[28]As the Third Circuit recognized, even with discretion, magistrates could not act arbitrarily. *In*
21   *the Matter of the Application*, 620 F.3d at 316-17. "Discretion is not whim…" *Martin v. Franklin*
     *Capital Corp.*, 546 U.S. 132, 139 (2005). A court must have a reason to support its use of
22   discretion, and that reason cannot be based on an error of law or fact. *See United States v. Ressam*,
     679 F.3d 1069, 1086 (9th Cir. 2012) (*en banc*) ("a district court abuses its discretion when it makes
23   an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left
     with a definite and firm conviction that the district court committed a clear error of judgment."
24   (internal quotation marks and brackets omitted)).

court to issue a § 2703(d) order *whenever* the government's application demonstrates reasonable suspicion.") (emphases in original; footnote omitted)).

Reading § 2703(d)'s "shall" as a command rather than a permission would render "only" surplusage: "[T]he difference between 'shall… if'… and 'shall … *only* if'… is dispositive." *In the Matter of the Application*, 620 F.3d at 315. As the Third Circuit stated, "the statute does contain the word 'only' and neither we nor the Government is free to rewrite it." *Id.* at 316; *see also Beck v. Prupis*, 529 U.S. 494, 506 (2000) (referring to "the longstanding canon of statutory construction that terms in a statute should not be construed so as to render any provision of that statute meaningless or superfluous.").

For the "only" in § 2703(d) to have meaning, it must be construed to allow a magistrate the discretion to deny an application for an order under § 2703(d), even if the government has made the necessary showing. To read the statute otherwise, the Third Circuit noted, "could give the Government the virtually unreviewable authority to demand a § 2703(d) order on nothing more than its assertion. Nothing in the legislative history suggests that this was a result Congress contemplated." *In the Matter of the Application*, 620 F.3d at 317. Denying magistrates discretion to decline to issue § 2703(d) orders "would preclude magistrate judges from inquiring into the types of information that would actually be disclosed by a cell phone provider in response to the Government's request, or from making a judgment about the possibility that such disclosure would implicate the Fourth Amendment, as it could if it would disclose location information about the interior of a home."[29] *Id.*

---

[29] Section 2703(d)'s discretionary plain meaning is made all the clearer by comparison to the pen register statute's mandatory language, where there is no "only," and the court simply "shall issue [an order for pen register surveillance] if" the government makes the required certification. 18 U.S.C. § 3123(a)(1); *see also* Fed. R. Crim. P. 41(d)(1) (providing, in mandatory terms, that judge "must issue the warrant if there is probable cause" for search or seizure).

1       Moreover, the statute explicitly encompasses the possibility that the government would

2   obtain a warrant, supported by probable cause, to obtain non-content information, such as CSLI,

3   from cell phone providers.  *See* 18 U.S.C. § 2703(c)(1)(A) (authorizing government to obtain non-

4   content records or information with federal or state warrant).  "[I]f magistrate judges were required

5   to provide orders under § 2703(d), then the Government would never be required to make the

6   higher showing required to obtain a warrant under § 2703(c)(1)(A)."  *In the Matter of the*

7   *Application*, 620 F.3d at 316.  The Third Circuit correctly rejected the government's argument

8   "that obtaining a warrant to get CSLI is a purely discretionary decision to be made by it, and one

9   that it would make only if a warrant were, in the Government's view, constitutionally required";

10  "it trivializes the statutory options to read the [warrant] option as included so that the Government

11  may proceed on one paper rather than two."  *Id.*

12      The doctrine of constitutional avoidance offers an additional reason for the Court to hold

13  that magistrates have discretion under the SCA to require the government to obtain a warrant for

14  CSLI.  The doctrine "rest[s] on the reasonable presumption that Congress did not intend" any

15  meaning of a statute "which raises serious constitutional doubts," *Clark v. Martinez*, 543 U.S. 371,

16  381 (2005), and "[i]t is therefore incumbent upon [the Court] to read the statute to eliminate those

17  doubts so long as such a reading is not plainly contrary to the intent of Congress."  *United States*

18  *v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994); *see also Clark*, 543 U.S. at 384 (courts must

19  adopt any "plausible" construction that would avoid serious constitutional concern).  There is no

20  indication that Congress intended to deny magistrates the discretion to reject applications for CSLI

21  orders.  *In the Matter of the Application*, 620 F.3d at 319.  Allowing them the discretion to require

22  the government to show probable cause when there is a risk of infringement upon Fourth

23

24

25  CR 15-XR-90304-HRL-1(LHK)
    Resp. to Govt. Appeal

                                                30

1    Amendment rights does no disrespect to Congress, which explicitly provided for warrants under §

2    2703(d), and avoids the potential for constitutional violations.

3    **VI.    THE GOVERNMENT MAY OBTAIN CSLI WITH A WARRANT BASED ON PROBABLE
              CAUSE**

4          The Federal Public Defender's position is not that the government may never obtain CSLI,

5    only that it must seek it pursuant to a warrant supported by probable cause.  When there are doubts

6    about the constitutionality of a particular type of search, law enforcement officers should err on

7    the side of the Fourth Amendment and get a warrant.  *United States v. Johnson*, 457 U.S. 537, 560-

8    61 (1982).  Officers already seek court orders under § 2703(d) to obtain CSLI; there will rarely, if

9    ever, be such an urgent need for this information that officers would not have time to get a warrant.

10   *See Riley*, 134 S. Ct. at 2493 ("Recent technological advances…have… made the process of

11   obtaining a warrant itself more efficient."); Fed. R. Crim. P. 41(d)(3) (authorizing magistrates to

12   issue warrant based on information communicated by phone "or other reliable electronic means").

13         In holding that the Fourth Amendment generally requires police to get a warrant before

14   searching a cell phone seized incident to arrest, the Supreme Court acknowledged that its decision

15   would "have an impact on the ability of law enforcement to combat crime" and that cell phones

16   "can provide valuable incriminating information about dangerous criminals."  *Riley*, 134 S. Ct. at

17   2493.  The same is true of CSLI.  But in striking the balance between a user's right to privacy in

18   "all [cell phones] contain and all they may reveal," *id.* at 2494, and law enforcement's interest in

19   obtaining this information, the Court chose to protect privacy: "Our answer to the question of what

20   police must do before searching a cell phone seized incident to an arrest is accordingly simple —

21   get a warrant."  *Id.* at 2495.  "Get a warrant" should be the Court's response when the government

22   seeks cell site location information as well.

23

24

25

**CONCLUSION**

In *Jones* and *Riley*, the Supreme Court confirmed that the Fourth Amendment continues – and changes – to protect reasonable expectations of privacy in a digital age.  We all have a reasonable expectation of privacy in our movements over time in public and, especially, private spaces.  Cell phone users reasonably expect that the government will not use their cell phones to track and record their movements, at least without adequate and constitutional justification.  This Court should follow *Cooper* in requiring the government to obtain a warrant when it seeks CSLI.

Dated: June 12, 2015

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

/S/
ELLEN V. LEONIDA
Assistant Federal Public Defender

CR 15-XR-90304-HRL-1(LHK)
Resp. to Govt. Appeal

32